## Page 1

1    IN THE UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF ILLINOIS

2

3    DUSTIN M. JAMES,    )
        )

4    Plaintiff,    )
        )

5    -vs-    )Cause No.
    )3:15-CV-01335-JPG-DGW

6    DEBRA HALE and CAPTAIN    )
    THOMAS TRICE,    )

7    )
    Defendants.    )

8

9    Deposition of MICHAEL P. ANGARONE, D.O., taken

10    before LISA A. BORDEN, C.S.R., and Notary Public,

11    pursuant to the Federal Rules of Civil Procedure for

12    the United States Courts pertaining to the taking of

13    depositions for the purpose of discovery, at Suite

14    1220, 70 East Lake Street, Chicago, Illinois,

15    commencing at 11:02 a.m., on the 10th day of July,

16    2018.

17
18
19
20
21
22
23
24

## Page 2

1    There were present at the taking of this

2    deposition the following counsel:

3    THE LAW OFFICE OF MATTHEW PRENGAMAN by
    MR. MATTHEW PRENGAMAN

4    70 East Lake Street
    Suite 1220

5    Chicago, Illinois 60601
    (773) 770-5074

6    matthew@prengamanlaw.com

7    on behalf of the Plaintiff;

8    SANDBERG PHOENIX & VON GONTARD PC by
    MR. UNTRESS L. QUINN

9    MS. ABBEY A. FRITZ
    600 Washington Avenue

10    15th Floor
    St. Louis, Missouri 63101

11    (314) 231-3332
    uquinn@sandbergphoenix.com

12    afritz@sndbergphoenix.com

13

    on behalf of the Defendant Debra Hale.

14
15
16
17
18
19
20
21
22
23
24

## Page 3

1    DEPOSITION OF
2    MICHAEL P. ANGARONE, D.O.
3    taken July 10, 2018
4
5    EXAMINATION BY    PAGE
6    Mr. Quinn    5, 92
7    Mr. Prengaman    89
8
9    EXHIBITS
10    PAGE
11
12    ANGARONE EXHIBIT 1    6
    (Curriculum Vitae)
13
    ANGARONE EXHIBIT 2    17
14    (Amended Notice of Deposition)
15    ANGARONE EXHIBIT 3    40
    (Dr. Angarone's Report
16    dated April 17, 2018)
17    ANGARONE EXHIBIT 4    43
    (Radiology Report dated 2/25/15)
18
    ANGARONE EXHIBIT 5    45
19    (St. Elizabeth's Hospital
    Medical Record dated 2/25/15)
20
    ANGARONE EXHIBIT 6    52
21    (St. Elizabeth's Hospital
    Medical Record dated 1/12/15)
22
    ANGARONE EXHIBIT 7    57
23    (Medical Progress Notes
    dated 2/19/2015)
24

## Page 4

1    PAGE
2    ANGARONE EXHIBIT 8    60
    (SLU Care Records)
3
    ANGARONE EXHIBIT 9    76
4    (Medical Progress Notes
    dated 2/23/2015)
5
    ANGARONE EXHIBIT 10    83
6    (St. Elizabeth's Hospital
    Emergency Room Record dated 3/21/15)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1 (Pages 1 to 4)

Page 5

1      (Witness sworn.)
2           MICHAEL P. ANGARONE, D.O.,
3    called as a witness herein, having been first duly
4    sworn, was examined upon oral interrogatories and
5    testified as follows:
6           EXAMINATION
7    BY MR. QUINN:
8      Q  Good morning, Dr. Angarone.
9      A  Good morning.
10     Q  My name is Trez, T-r-e-z, Quinn, and I'll be
11   asking most of the questions today.  We met briefly
12   of course right before we went on the record.  I
13   represent Debra Hale in this particular case, okay?
14     A  Yes.
15     Q  You've given a deposition before, haven't
16   you?
17     A  Yes, I have.
18     Q  Okay.  So I don't need to waste your time
19   with the rules of it, but just let me preface it by
20   saying if you don't understand a question, just ask
21   me to repeat it, okay?
22     A  Okay.
23     Q  Can we agree that if you answer the question
24   you understood the question?

Page 6

1      A  Yes.
2      Q  All right.  Please state your name for the
3    record, please.
4      A  Michael Angarone.
5      Q  And, Doctor, you are a D.O.?
6      A  Yes.
7      Q  Not an M.D.?
8      A  No, a D.O.
9      Q  And my understanding is the difference is
10   just the basic philosophy of medicine?
11     A  Yes.
12     Q  And you guys deal with more holistic
13   approaches?
14     A  We learn more musculoskeletal medicine in
15   addition to the standard medicine that allopathic or
16   M.D. physicians learn.
17     MR. QUINN:  Okay.  I'm going to mark as Exhibit 1
18   the CV that we have.
19          (Whereupon, Angarone Exhibit 1 was marked
20          for identification.)
21   BY MR. QUINN:
22     Q  So looking at Exhibit 1, this appears to be
23   your curriculum vitae, correct?
24     A  Yes.

Page 7

1      Q  And just take a look at it.  The first page
2    the top upper right corner, updated 7/26 of last
3    year, 2017?
4      A  Yes.
5      Q  Is this the most current and up to date?
6      A  As of right now, yes.
7      Q  Okay.  All right, what is your -- let's go
8    through your CV.
9           What is your professional address?
10     A  It is 645 North Michigan Avenue.
11     Q  And is that a -- and so that's
12   Northwestern Memorial Hospital?
13     A  Yes.
14     Q  And that's your primary place of employment?
15     A  Yes.
16     Q  Okay.  And we'll talk about that in just a
17   second.
18          So it looks like you graduated from -- do
19   they call it medical school?
20     A  Yes.
21     Q  Medical school in 2002?
22     A  Yes.
23     Q  From Chicago College of Osteopathic Medicine?
24     A  Correct.

Page 8

1      Q  All right.  How long is that program?
2      A  Four years.
3      Q  Four years, okay.  And thereafter you
4    completed an internal medicine internship and
5    residency at Loyola University Medical Center from
6    2002 to 2005?
7      A  Correct.
8      Q  And you were a chief resident from 2005 and
9    2006?
10     A  Correct.
11     Q  And that was internal medicine, right?
12     A  Yes.
13     Q  And from '06 to '09 you did an infectious
14   disease fellowship with Northwestern Memorial
15   Hospital?
16     A  Correct.
17     Q  Could you explain to us what the infectious
18   disease fellowship consisted of.
19     A  So the fellowship is a more focused training
20   in infectious disease, so it has both clinical and a
21   research component.  So the clinical component is
22   focused on seeing individuals with infections, seeing
23   individuals with HIV, other infectious diseases and
24   learning to become an expert in taking care of those

2 (Pages 5 to 8)

MICHAEL ANGARONE MD  7/10/2018

Page 9

1  infections.
2       The research component is a research year
3  to two years dedicated to research in infectious
4  disease whether that's clinical research or bench
5  research or both.
6    Q  Now, was this fellowship directed towards
7  what you describe as treating opportunistic
8  infections?
9    A  All infections, so opportunistic infections
10  fall under the purview of infectious disease.
11    Q  Okay.  And so from July '08 to July '09 it
12  looks like you were a research assistant in oncology/
13  immunology?
14    A  Correct.
15    Q  What is that exactly?
16    A  So the research project that I worked on was
17  a research project that was headed under the
18  oncology/immunology division, and that was looking at
19  markers for rectal and colon cancer that could then
20  be used for markers for rectal cancer in individuals
21  with HIV or AIDS.
22    Q  Okay.  And so you are board certified, right?
23    A  Yes, I am.
24    Q  And what are your board certifications at

Page 10

1  this time?
2    A  In internal medicine and in infectious
3  disease.
4    Q  Is that a dual board certification or are
5  those separate?
6    A  They're separate, so you have to take a board
7  test for internal medicine and then a board test for
8  infectious disease.
9    Q  Is that a written exam or oral?
10    A  They're both written.
11    Q  Both written, okay.  And when were you first
12  board certified?
13    A  Internal medicine was in 2005 and then I
14  recertified in 2015, and then infectious disease was
15  in 2008 and then I recertified this year.
16    Q  For the internal medicine board
17  certifications did you pass on the first attempt?
18    A  Yes.
19    Q  What about infectious disease?
20    A  Yes.
21    MR. QUINN:  Off the record.
22       (Discussion had off the record.)
23  BY MR. QUINN:
24    Q  It looks like from '08 to 2018 this says

Page 11

1  Diplomat in Infectious Disease, American Board of
2  Internal Medicine.  What exactly is that?
3    A  So that's the board certification for
4  infectious disease.  It's run through the American
5  Board of Internal Medicine.
6    Q  And you have to recertify for both internal
7  medicine and infectious disease like every ten years?
8    A  Yes.
9    Q  So you're not godfathered in?
10    A  No, I'm not.
11    Q  All right.  So it looks like you have some
12  military service history?
13    A  Yes.
14    Q  You were a -- what was your highest rank?
15    A  I was a specialist which is an E4.
16    Q  Okay.  And were you honorably discharged?
17    A  Yes.
18    Q  Okay.  So you're currently employed at
19  Northwestern Memorial Hospital, right?
20    A  Yes.
21    Q  As an infectious disease doctor?
22    A  Yes.
23    Q  When did you start there?
24    A  I started after my fellowship in 2009.

Page 12

1    Q  And you've been there ever since?
2    A  Yes.
3    Q  Tell me about just briefly what your position
4  entails at Northwestern.
5    A  Sure.  I'm an assistant professor at
6  Northwestern Medicine and then the Northwestern
7  University Feinberg School of Medicine.  My primary
8  job is clinical practice, so I see patients on the
9  infectious disease consulting service primarily in
10  the opportunistic infection host service, so I see
11  mostly solid organs, stem cell transplant recipients,
12  individuals with HIV, AIDS on that clinical service.
13  I have a clinic twice a week in which I see either
14  patients that fall under that opportunistic infection
15  group or general infectious disease patients that are
16  referred to me by other providers.  I also see about
17  50 percent of my clinic is HIV-infected individuals.
18  And then I also have teaching responsibilities, so
19  about 40 to 50 percent of my time is also spent in
20  medical education.
21    Q  What type of medical education?
22    A  So I'm the clerkship director for the
23  fourth-year medical student sub-internship so that's
24  when the fourth-year medical students can act like an

3 (Pages 9 to 12)

MICHAEL ANGARONE MD  7/10/2018

Page 13

1    intern, so they spend four weeks in a role in which
2    they're acting like an intern, kind of give them a
3    little bit of a preview of that. I also do teaching
4    on the small group teachings that happen throughout
5    the year for the first-year medical students as well
6    as the third-year medical students.
7        Q   And that consists primarily in the area of
8    infectious disease?
9        A   Some infectious disease and some just general
10   internal medicine as well.
11       Q   Now, have you ever practiced in just general
12   internal medicine after your residency?
13       A   So I do practice just internal medicine when
14   I work on the hospital wards with the residents, so I
15   usually do four to six weeks a year where I'm the
16   attending of record for patients that are admitted to
17   the hospital under the general internal medicine
18   hospital service.
19       Q   Why do you do that?
20       A   Pardon me?
21       Q   Why do you do that, what requirement --
22       A   So I do that as part of my educational
23   responsibilities for the medicine residency program
24   as well as I'm a general internist and I enjoy

Page 14

1    general internal medicine.
2        Q   Do you currently treat patients who have
3    suffered any type of trauma?
4        A   Yes, if they get admitted to my general
5    internal medicine service or on the infectious
6    disease consulting service if we get consulted.
7        Q   Okay.  So you would treat that patient in
8    general in internal medicine absent infectious
9    disease?
10       A   Absent infectious disease if for whatever
11   reason they get admitted to our service because they
12   have medical issues that are more complex for the
13   general surgery team to manage and they need the
14   general internist to manage those while the surgical
15   team manages the trauma.
16       Q   Okay.  And you are an attending physician?
17       A   Yes.
18       Q   Since 2009?
19       A   Yes.
20       Q   Okay.  I'm looking at your administrative
21   appointments on your CV, and you would agree that the
22   majority of these appointments consisted of the
23   infectious disease area of medicine or is that not
24   correct?

Page 15

1        A   Yes, about 50 percent because I do have the
2    clerkship director role and I am a core faculty
3    member for the internal medicine residency program
4    and I also have medical school responsibilities as
5    well.
6        Q   Under professional society memberships, you
7    are a member of the American College of Physicians?
8        A   Yes.
9        Q   And also a member of Infectious Disease
10   Society of America?
11       A   Yes.
12       Q   And also Alliance for Academic Internal
13   Medicine/Clerkship Directors in Internal Medicine?
14       A   Yes.
15       Q   Do any of these societies have positions on
16   providing expert testimony to your knowledge?
17       A   Not to my knowledge.  I'm not aware.
18       Q   Okay.  You have authored some peer-review
19   articles as well as it appears some editorials and
20   chapters in books?
21       A   Correct.
22       Q   Taking a look at your CV, do any of these
23   particular articles, chapters, reviews or editorials
24   directly involve the subject of this lawsuit?

Page 16

1        A   No, they do not.
2        Q   Okay.  And it looks like that most of your
3    articles, publications involve infectious diseases,
4    right?
5        A   Correct.
6        Q   All right.  Now, you are not a licensed
7    practical nurse of course?
8        A   I am not, no.
9        Q   And you have never -- you're not a registered
10   nurse either?
11       A   I am not.
12       Q   So you are not a nurse of any kind?
13       A   I am not.
14       Q   And you've never gone to nursing school of
15   any type?
16       A   I have not, no.
17       Q   And you don't consider yourself an expert in
18   nursing?
19       A   I do not, no.
20       Q   Because the training, you would agree, for
21   doctors and nurses is different?
22       A   Yes.
23       Q   Nurses whether they're RNs or LPNs cannot
24   prescribe medication, can they?

4 (Pages 13 to 16)

MICHAEL ANGARONE MD  7/10/2018

Page 17

1    A  No, they cannot.
2    Q  And they cannot provide medical diagnoses,
3  correct?
4    A  They cannot, no.
5    Q  And you've never worked in a jail or a
6  prison, right?
7    A  I have not, no.
8    Q  Have you sat on any type of a board involving
9  medical care provided in a correctional institution
10  such as a jail or prison?
11    A  I have not, no.
12    MR. QUINN: Okay. Let me have the deposition
13  notice, the amended one. We'll mark the amended
14  notice of deposition as Exhibit 2.
15      (Whereupon, Angarone Exhibit 2 was marked
16       for identification.)
17  BY MR. QUINN:
18    Q  Have you seen this notice before today?
19    A  Yes, I have.
20    Q  If you look at page 2, there's an attachment
21  that says documents to produce, do you see that?
22    A  Yes.
23    Q  Have you seen this document before this
24  morning?

Page 18

1    A  Yes.
2    Q  Have you brought any of the items listed on
3  the documents here, the documents to produce list?
4    A  So the information that was provided to me
5  for the case was all electronic in nature. I have
6  the -- my writeup on the case which contains my
7  invoice to Richard Dvorak, so my invoice for the
8  hours spent which is item number 8, and then the
9  notes that I had written on the case.
10    Q  Okay. Go ahead, I'm sorry.
11    A  And then the other information I have is one
12  of the other cases that I worked on with Richard
13  Dvorak.
14    Q  Sure, and we'll talk about that in just a
15  second.
16      So you didn't print out anything that you
17  received electronically?
18    A  I did not, no.
19    Q  Okay. And is there any reason why you didn't
20  print it out?
21    A  I was informed that I should just bring
22  these.
23    Q  I wonder why.
24      Okay. Well, did you make any highlights

Page 19

1  on any of the documents you received?
2    A  I did not, no.
3    Q  When you received them electronically, did
4  you print them yourself for your review?
5    A  I did not, no.
6    MR. QUINN: Okay. Matthew, how hard would it be
7  for us to get what he has electronically?
8    MR. PRENGAMAN: I mean, I did e-mail to him this,
9  but I think we could just find the e-mail I hope, but
10  I just know it would have been the medical records.
11    MR. QUINN: Just the medical records.
12    THE WITNESS: Yeah, it was all the medical
13  records.
14    MR. PRENGAMAN: Yeah, I sent him the medical
15  records and the deposition transcripts.
16    MR. QUINN: Okay.
17  BY MR. QUINN:
18    Q  Did you receive any correspondence from
19  anyone?
20    A  So just the e-mails with the access to the
21  medical records which I can look on my computer on my
22  e-mail if you want.
23    Q  That's fine.
24      Could I take a look at what you did bring

Page 20

1  real quick. I'll just give it back.
2    A  Sure.
3    Q  Just for the record, Dr. Angarone brought his
4  report that he authored dated 4/17/2018 as well as
5  one, two, three, four, five, six, seven, eight, nine
6  pages of handwritten notes, is that correct?
7    A  Yes.
8    MR. QUINN: Is there any way, Matt, we can get a
9  copy of these notes?
10    MR. PRENGAMAN: Sure.
11    MR. QUINN: Okay. Before we leave we'll get a
12  copy of those.
13  BY MR. QUINN:
14    Q  What in general is contained in your notes?
15    A  Just highlights from each of the records from
16  the case and information from the depositions that I
17  reviewed.
18    Q  Okay. Let me ask you this. When were you
19  first contacted about this case? If you need to look
20  at your computer you can or your phone.
21    A  I can look at the e-mail. I believe it was
22  in February of this year.
23      So April 9th is when I was given an e-mail
24  with information about the electronic case files.

5 (Pages 17 to 20)

MICHAEL ANGARONE MD  7/10/2018

Page 21

1      Q   What did the e-mail state just in general?
2      A   It just --
3      Q   Other than the attachment, what does it say?
4      A   It just says the following transaction was
5   entered 4/9/2018 for the case name James v. Hale with
6   the case number, order granting motion -- oh, this is
7   for the extension, sorry, for the report.  Sorry, my
8   phone it's difficult to pull up.
9      MR. QUINN:  Let me just say this.  Matt, we would
10  like a copy of his file.  I think we have a right to
11  that.
12     THE WITNESS:  I can look to see if all of it is
13  on my computer if that's okay.
14     MR. QUINN:  Yeah, that's fine.
15     THE WITNESS:  Because then I can print it from
16  here if you have the ability to do that.
17     MR. QUINN:  Yeah, we don't necessarily need you
18  to reprint like the medical records and things we
19  already have, but it's simply, you know, the cover
20  letter, those types of things.
21     BY MR. QUINN:
22     Q   So you were first contacted February of 2018
23  to review this case, correct?
24     A   Yes.

Page 22

1      Q   And do you know who contacted you?
2      A   Richard Dvorak.
3      Q   Okay.  And was it by telephone or by
4   correspondence?
5      A   Through e-mail.
6      Q   Okay.  And do you recall the nature of the
7   communication in that e-mail?
8      A   It just asked me if I would be interested in
9   reviewing the case.
10     Q   Okay.  Did you -- were you told anything
11  about the case prior to your review?
12     A   So I talked to Richard on the phone and he
13  told me that the case involved someone who had a
14  facial infection and then that's all that he told me.
15     Q   Okay.  So you knew he had an infection prior
16  to you reviewing the records?
17     A   Yes.
18     Q   And was that phone call -- when did that
19  phone call occur?
20     A   Probably shortly thereafter.  I don't
21  remember the specifics.  Again, on my phone I can't
22  look up all the e-mails back then.
23     Q   Sure.  And so you knew he had an infection.
24  Did you know anything else about the case before you

Page 23

1   reviewed it?
2      A   I did not, no.
3      Q   And what were you tasked to do?
4      A   To review the case.
5          So I was asked to review the case.  Sorry,
6   I just found the original e-mail from the case.
7      Q   Sure.  So you were asked to review the case.
8   Is that it?
9      A   Yes, I was asked to review the case, and then
10  after I reviewed the case and spoke to Mr. Dvorak, he
11  asked me if I would write my opinion on the case.
12     Q   So were you asked to review the case to offer
13  opinions on any specific issues?
14     A   Just offer my opinion on the care that was
15  provided to Mr. James regarding the timeliness of
16  identifying his infection and the treatment provided
17  and any long-term effects related to the infection.
18     Q   Okay.  So were you asked to offer opinions
19  with regard to Debra Hale's involvement in the care
20  and treatment of the plaintiff in this case?
21     A   So the overall handling of the case, and
22  Debra Hale was in charge of his care, and so the
23  management of identifying whether or not he had an
24  infection and whether or not the treatment was given

Page 24

1   in a timely manner.
2      Q   Okay.  And so the overall treatment provided,
3   and then you understand that Debra doesn't prescribe
4   medications, correct?
5      A   Yes.
6      Q   And she doesn't make medical diagnoses,
7   correct?
8      A   Yes.
9      Q   You understand that she cannot refer anyone
10  to an outside physician without a doctor's order, do
11  you understand that?
12     A   Yes.
13     Q   Okay.  And we'll get into your report in just
14  a second.
15         Have you ever been sued as a defendant?
16     A   Yes.
17     Q   How many times?
18     A   One.
19     Q   And what was the name of the case?
20     A   It's -- now I can't remember the name.  It's
21  still in the process of collecting information on the
22  case.
23     Q   So it's a new case?
24     A   It's a new case.  It has not gone to trial.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

MICHAEL ANGARONE MD  7/10/2018

| Page 25 |
| --- |

```
 1        Q  So it was filed in what year?
 2        A  It was filed I believe 2015. It's Meyers.
 3        Q  M-y --
 4        A  M-e-y-e-r-s.
 5        Q  Okay.  And versus -- are you the sole
 6   defendant?
 7        A  It's myself and one other provider, and I
 8   cannot remember the name of the provider.
 9        Q  Okay.  And what court was that filed?
10        A  That I don't have the information for.
11        Q  Have you given any depositions in that case?
12        A  I gave my deposition of the care provided for
13   the plaintiff.
14        Q  And when did you give your deposition
15   approximately?
16        A  That was done January or February of this
17   year.
18        Q  Okay.  What does that case involve?
19        A  It involves a necrotizing fasciitis of the
20   lower extremity.
21        Q  And what are the allegations against you?
22        A  Not providing immediate care and antibiotics.
23        Q  Okay.  And so -- and that's the only case,
24   right?
```

| Page 26 |
| --- |

```
 1        A  Yes.
 2        Q  As far as your medical-legal activity, how
 3   long have you been involved in reviewing cases as an
 4   expert consultant or witness?
 5        A  For about five years.
 6        Q  And what are your current fees?  Is it $350
 7   per hour?
 8        A  $350 per hour for review and then $500 per
 9   hour for deposition and court appearance.
10        Q  And how many cases do you currently -- how
11   many cases per year do you currently review let's say
12   in the last five years?
13        A  It's been about -- it averages between two
14   and three.
15        Q  Has that increased or decreased -- well, I
16   guess you have only been doing it for five years so I
17   guess that's the way it's been.
18        A  Yes, two to three a year.
19        Q  And so I know in your report you list some
20   information about deposition testimony in the last
21   four years, we'll get to that in a second, but you
22   have given depositions in your cases in which you've
23   acted as an expert, correct?
24        A  Yes, I have.
```

| Page 27 |
| --- |

```
 1        Q  Did you list those on your report?
 2        A  I believe.  Let me see, did I?  So at the
 3   time of writing I listed the one that I did for Beth
 4   Helm.  Since then there's been one other that I've
 5   done.
 6        Q  Okay.  What's the one other case you've given
 7   a deposition?
 8        A  That is -- I have to find the name of it
 9   here.  It's Casteel, C-a-s-t-e-e-l, v. P-E-P, et al.
10        Q  Do you know what court that was filed in?
11        A  This is in I believe Kentucky is where this
12   was filed in -- this was Indiana, sorry.
13        Q  And you gave a deposition as an expert
14   witness in that case?
15        A  Yes.
16        Q  And what year was that approximately?
17        A  This deposition was done two months ago in
18   April of 2018.
19        Q  And what did that case involve?
20        A  That case involves -- I have to remember
21   exactly what it was.  It was -- the case involved
22   failure to appropriately treat a urinary tract
23   infection with sepsis/septic shock.
24        Q  Was it a matter of a delay in treatment?
```

| Page 28 |
| --- |

```
 1        A  Yes.
 2        Q  And you opine in this case about a delay in
 3   treatment of an infection?
 4        A  Yes.
 5        Q  And you're actually being sued for delay in
 6   treatment of an infection, correct?
 7        A  Yes.
 8        Q  And so you've only given two depositions in
 9   the last four years as an expert witness?
10        A  Yes.
11        Q  What about trial testimony in the last four
12   years?
13        A  I have not.
14        Q  Okay.  And so you have worked for I think you
15   said Richard Dvorak in the past?
16        A  Yes.
17        Q  And how many times?
18        A  Once.
19        Q  And you were -- did you give a deposition in
20   any of the cases you were representing him?
21        A  I did not, no.
22        Q  And what type of cases did you review for
23   Mr. Dvorak?
24        A  That was involving an individual with HIV who
```

7 (Pages 25 to 28)

MICHAEL ANGARONE MD  7/10/2018

## Page 29

1  developed a dental infection that subsequently turned
2  into a dental abscess and empyema or infection around
3  the lung that was not treated.
4     Q   And so the number of cases in total that you
5  reviewed as an expert witness has been how many?
6     A   I would say to try to estimate it it's
7  between 10 and 15.  I can't remember the exact
8  number.  Like I said, it's about two to three per
9  year.
10    Q   Okay, right.  Have you ever acted as an
11 expert witness for a defendant?
12    A   Yes.
13    Q   How many times?
14    A   A majority of the 10 to 15 has been for
15 defendant.
16    Q   So the percentage would be?
17    A   I would say probably 60 to 70 percent
18 defendant.
19    Q   The case you've given a deposition, Casteel,
20 was that for the plaintiff or the defendant?
21    A   Defendant.
22    Q   The case you listed on your report which
23 we're going to get into in a second, was that for a
24 plaintiff or a defendant?

## Page 30

1     A   Defendant.
2     Q   Have you ever worked for Matthew?
3     A   I have not, no.
4     Q   What about Adrian, Bleifuss & Prados, have
5  you worked for them?
6     A   No.
7     Q   How many open files do you currently have for
8  medical-legal review?
9     A   Two not including this one.
10    Q   Okay.  So three in total?
11    A   Yes, yes.
12    Q   So the cases where you've acted or you've
13 reviewed for a defendant, have that included a
14 defendant doctor or hospital?
15    A   Doctor, defendant doctor.
16    Q   All of them were doctors?
17    A   Yes, as far as I can remember, yes.
18    Q   And were they infectious disease doctors
19 or --
20    A   Not all were infectious disease.  One was
21 infectious disease.  The rest were general
22 practitioners or emergency room physicians.
23    Q   And your review involved the treatment of an
24 infection?

## Page 31

1     A   The treatment of an infection, yes.
2     Q   And so what method do you use for billing?
3  Do you send an invoice?
4     A   Yes, usually I send an invoice at the end
5  after I'm done reviewing all the paperwork.
6     Q   Did you send an invoice in this case to the
7  attorneys?
8     A   I did, and it's item number 8 on my report.
9     Q   Okay.  Did you send an actual invoice though?
10    A   This is the only invoice that I send.
11    Q   Just in your report, okay.
12        So in this case you billed about seven
13 hours?
14    A   Yes.
15    Q   And the total bill was how much again?
16    A   Seven times 350, I'll do the math --
17    Q   I got it here.
18    A   Like $2600, something like that.
19    Q   $2450?
20    A   $2450.
21    Q   Okay.  Any other -- that's it, $2450?
22    A   That's it, yes.
23    Q   Okay.  And you spent about seven hours thus
24 far reviewing?

## Page 32

1     A   Yes.
2     Q   And that doesn't include your deposition time
3  here?
4     A   Correct, it does not.
5     Q   Your time for your deposition today would be
6  $500 an hour?
7     A   Yes.
8     Q   Okay.  Would that include any type of travel?
9     A   No.
10    Q   Because you are local?
11    A   Yes, I'm local.
12    Q   Doctor, do you intend to rely on any
13 literature or articles in this case to support your
14 opinions you've offered?
15    A   For this case I have not, no.
16    Q   What percentage of your income is derived per
17 year for your medical-legal activities?
18    A   Maybe two or three percent.
19    Q   Okay.
20    A   Yeah, I believe if the math is right.
21    Q   Are there any textbooks or journals that you
22 consider to be authoritative in your field of
23 practice?
24    A   Yes, Infectious Disease, Mandell, Principles

8 (Pages 29 to 32)

MICHAEL ANGARONE MD  7/10/2018

Page 33

1  of Infectious Disease.
2      Q  That's all one book?
3      A  Yes.
4      Q  Any others?
5      A  For textbooks that is kind of the best
6  textbook of infectious disease.  For journals there's
7  Clinical Infectious Diseases and the Journal of
8  Infectious Diseases so CID and JID.
9      Q  And you consider those to be authoritative?
10     A  Yes.
11     Q  What about are there any websites like
12  medical information websites that you rely on that
13  you consider authoritative?
14     A  I use things like UpToDate when I'm in the
15  hospital.
16     Q  Okay.
17     A  The New England Journal of Medicine website
18  as well as the journal itself has resources for
19  physicians.  The same thing with the American College
20  of Physicians, the ACP, their website has information
21  for physicians as well as guidelines.
22     Q  Okay.  So, Doctor, what exactly is an
23  abscess?
24     A  So an abscess is an area inside the body so

Page 34

1  usually under the skin or it can be an internal organ
2  in which infection develops, so bacteria get into
3  that site.  The immune response is white blood cells
4  get attracted to that area, infiltrate the area and
5  try to kill those bacteria.  Some of those bacteria
6  die.  Some of the white blood cells die.  There's an
7  accumulation of the debris or the material from that
8  process that develops underneath the skin or within
9  that organ, and the process just continues until
10  either the infection gets so bad that it causes
11  symptoms, so fevers, pain, dysfunction of that organ,
12  or if it's near the skin that abscess will work its
13  way towards the skin, open up the skin and
14  spontaneously drain which can occur in organs as
15  well.
16     Q  Right.  What type of fever or temperature
17  would you expect to see with someone with an abscess?
18     A  It could vary.  So some people can have
19  fevers that we would call low grade fevers so
20  elevated temperatures with the normal being around
21  98, 98 and a half, so people can have temperatures of
22  99, 100 that may persist for a few days, and then the
23  temperature starts to increase when we see a more
24  serious abscess or an abscess that has developed into

Page 35

1  a larger infection.  The fever then goes to 101 or
2  102 or higher.
3      Q  Okay.  Does the fever continue to rise in the
4  face of antibiotic treatment?
5      A  It can.  So as the infection is being treated
6  with an antibiotic, more of those bacteria are dying,
7  and so often the fever is a response to those
8  bacteria that are dying and our immune response so
9  our immune system trying to take care of that
10  response.  So the fever can either persist or go up
11  usually for 48 hours or 72 hours while someone is on
12  treatment, and then if the treatment is appropriate,
13  that fever will tend to go down.
14         In the case of some abscesses if they're
15  not drained, that fever can persist or that abscess
16  could persist because the antibiotic may not be able
17  to fully penetrate down into the abscess, so you're
18  treating it partially and not fully, so that's where
19  often we look at from an infectious disease
20  standpoint one of the best treatments for an abscess
21  is to actually try to drain the abscess.
22     Q  Is periodontal disease associated with
23  infections?
24     A  It can be.

Page 36

1      Q  And what exactly in your knowledge of
2  periodontal disease, I know you're not a dentist, but
3  you have some knowledge about what that is, correct?
4      A  Correct.
5      Q  And what is that exactly?
6      A  So usually that's decay of a tooth or damage
7  to the gums either from poor oral hygiene or damage
8  to the gums that can affect the root of the tooth.
9  That root of the tooth can develop fluid and then
10  bacteria that are in the mouth can get into that root
11  causing an abscess, and it could be the root of a
12  dental abscess or a mouth abscess as well as be a
13  consequence of having poor periodontal health.
14     Q  And can you have an infection resulting from
15  periodontal disease without having an abscess?
16     A  Yes, you can.
17     Q  Okay.  And would that particular type of
18  infection also result in like low grade fever?
19     A  It can, again, depending on the extent of the
20  infection but it can.
21     Q  How are abscesses normally diagnosed?
22     A  It depends on where they're at.  If you're
23  talking more about a skin abscess, it's really the
24  symptoms that the person may be having, so pain or

9 (Pages 33 to 36)

MICHAEL ANGARONE MD  7/10/2018

Page 37

1  pressure in the area where the abscess is.  On exam
2  the skin may be fluctuant or boggy, so I liken it to
3  kind of trying to push your finger into a water
4  balloon or into a balloon.  It's kind of mushy
5  compared to the normal texture of the skin or the
6  soft tissue.  The external area of the skin as the
7  abscess progresses can become red, warm, and the skin
8  can be swollen and very firm so you may not sense
9  that water balloon-like feeling because of the
10  firmness of the skin overlying the abscess.
11     Q   What about an abscess that's inside of the
12  body?  How would you diagnose that?
13     A   So typically that's diagnosed with imaging,
14  so if it's on an internal organ or a deep abscess,
15  the individual may have symptoms that again are
16  associated with pain, swelling, dysfunction of
17  whatever organ or body structure is in the area where
18  the abscess may be.
19     Q   Okay.
20     A   And so that would prompt imaging or
21  evaluation.  Again, the individual may have symptoms
22  of an infection, so fevers that may be again that low
23  grade so 100 or 100.5, labs may indicate an elevated
24  white blood cell count but --

Page 38

1     Q   What would you -- I'm sorry, go ahead and
2  finish, I'm sorry.
3     A   But typically the symptoms really involve or
4  the way to identify it really involves the patient or
5  the person complaining about something.  That then
6  tells us we should look for something and then we
7  find an abscess.
8     Q   What type of an increase in white blood cells
9  would you see with an abscess like an internal or
10  deep abscess?
11     A   Again, it can be variable, so you can have
12  slight elevations, so elevations to ten-and-a-half or
13  11, which might just be over what is considered the
14  upper limit of normal, to very large or extensive
15  abscesses that can have white blood cell counts 20,
16  30, 40,000, so much higher.
17     Q   So the presentation of an abscess would
18  include a fever, could be low grade, elevated white
19  blood cell counts, pain?
20     A   Pain.
21     Q   Any other presentation signs?
22     A   Organ or body dysfunction depending on where
23  the abscess is at.
24     Q   Okay.  As an infectious disease specialist,

Page 39

1  do you review radiology films like CAT scans?
2     A   Yes, I do.
3     Q   And so you're able to look at a film and
4  identify an abscess, right?
5     A   Yes, yes.
6     Q   Okay.  What do you see on a film, a CT scan,
7  when you diagnose an abscess?  What does it look
8  like?
9     A   So typically it's going to be an area that's
10  going to have fluid that's of a different contrast
11  color of the tissues that are around it, so it may be
12  darker if that fluid has a lot of water inside of it
13  so it may be kind of more black or dark gray as
14  opposed to the surrounding tissue which may be more
15  of a whiter texture if it's in a muscle or in the
16  fat.  There may be a well demarcated line around that
17  fluid indicating kind of the border of the abscess
18  that may be seen.  Some abscesses may be very small
19  and what you may see are just alterations in some of
20  the underlying tissues that might be present.
21     Q   Okay.  Now, you don't do the official
22  reading --
23     A   I do not, no.
24     Q   Let me finish the question just so the record

Page 40

1  is clear.
2          You don't do the official reading of the
3  CT scan though, correct?
4     A   I do not.
5     Q   The radiologist does that?
6     A   Yes.
7     Q   So when there is a diagnosis of an abscess,
8  what do you expect to see on the official report?
9     A   The report would indicate fluid that appears
10  abnormal, fluid that may have a rim around it or a
11  contrast enhancement that's different than the
12  surrounding fluid, and the radiologist may offer a
13  comment that the finding could be consistent with an
14  abscess.  Often it's very hard to distinguish that,
15  so there may be other things that are listed as well
16  such as hematoma or cyst that might be there, but
17  that's typically what the radiologist would read.
18     MR. QUINN:  I want to mark your report as
19  Exhibit 3.
20         (Whereupon, Angarone Exhibit 3 was marked
21          for identification.)
22  BY MR. QUINN:
23     Q   So you authored a report of your opinions,
24  correct?

10 (Pages 37 to 40)

MICHAEL ANGARONE MD   7/10/2018

Page 41

1    A  Yes.

2    Q  And the date of the report is April 17, 2018,

3  right?

4    A  Yes.

5    Q  And I want to kind of go through your report

6  here and ask some questions about this report.

7       So the first documents you reviewed to

8  come to your opinions are listed under number 3 of

9  your report, correct?

10   A  Yes.

11   Q  And it looks like you reviewed the medical

12  records from St. Elizabeth's Hospital, correct?

13   A  Yes.

14   Q  The medical records from Wexford Health

15  Sources Incorporated?

16   A  Yes.

17   Q  The medical records from Quantum Vision

18  Centers, right?

19   A  Yes.

20   Q  The medical records from Archview Medical

21  Specialists?

22   A  Yes.

23   Q  The medical records from SLU Care?

24   A  Yes.

Page 42

1    Q  The medical records from St. Claire County

2  Jail?

3    A  Yes.

4    Q  As well as the deposition transcripts of

5  Dustin James, the plaintiff, and Debra Hale, correct?

6    A  Yes.

7    Q  And you have not reviewed anything other than

8  what's contained in number 3, correct?

9    A  Yes, just those.

10   Q  All right.  And you have not reviewed any

11  radiology films in this case?

12   A  No, just the reports from the radiology

13  films.

14   Q  Okay.  And you didn't review the deposition

15  testimony of Captain Trice, right?

16   A  I did not.

17   Q  Do you think it would have been helpful to

18  review the radiology films to render your opinion

19  about an abscess formation?

20   A  Again, I'm not a radiologist so even when I

21  review a film on my own, which I try to look at every

22  film that I order on my patients, if I see something

23  I will go and ask the radiologist, you know, what is

24  this or, you know, you commented on the presence of

Page 43

1  something and then I'll ask them what exactly that is

2  or what exactly they're looking at.  So since I'm not

3  a radiologist I'm not qualified to comment on that.

4  If there's anything that I see, I'll actually go and

5  speak with the radiologist.

6    Q  Okay.  And you reviewed a radiology report in

7  this case, right?

8    A  Yes, I did.

9    MR. QUINN:  I'll mark a radiology report from St.

10  Elizabeth's Hospital dated 2/25/15 as Exhibit 4.

11       (Whereupon, Angarone Exhibit 4 was marked

12        for identification.)

13  BY MR. QUINN:

14   Q  Now, Doctor, you have given an opinion in

15  this case that the plaintiff in fact had an abscess,

16  right?

17   A  Yes.

18   Q  And you have acknowledged, however, that you

19  have not reviewed any radiology films in this

20  particular case, right?

21   A  Correct.

22   Q  And one of the reports you reviewed is

23  Exhibit No. 4 which is the -- it looks like this is a

24  CT scan with contrast that was done at

Page 44

1  St. Elizabeth's Hospital on April -- I'm sorry,

2  February 25th, 2015, is that right?

3    A  Correct.

4    Q  And under the findings section, I want to

5  bring your attention to the third line from the

6  bottom where it talks about there is a possible deep

7  abscess measuring 12 millimeters in diameter.  Did I

8  read that correctly?

9    A  Yes.

10   Q  Your opinion about the existence of an

11  abscess in this case, does it stem from your review

12  of this report?

13   A  Yes.

14   Q  Is there anything else you reviewed that

15  allowed you to conclude that there was in fact an

16  abscess or that Mr. James in fact had an abscess in

17  this case?

18   A  Just the report and then the physical exam

19  findings I think prior to this CAT scan being done of

20  the swelling that he had on his face the size of a

21  tennis ball.

22   Q  Now, you agree that a person who is struck in

23  the face can have swelling in their face?

24   A  Yes.

11 (Pages 41 to 44)

MICHAEL ANGARONE MD   7/10/2018

Page 45

1    Q   And that swelling could be the result of the
2    trauma itself, correct?
3    A   Yes.
4    Q   And it doesn't mean that they have an
5    infection necessarily?
6    A   Not necessarily.  It depends on when that
7    swelling occurs related to the trauma.
8    Q   Okay.  And so in this case the trauma
9    occurred on January the 11th, 2015, does that sound
10   about right?
11   A   Yes.
12   Q   Are you opining that just because he had
13   swelling on the examination that was done on 2/25/15,
14   let's assume that there was swelling on that date,
15   that that must have been an infection?
16   A   Based on his symptoms at the time on the 25th
17   and before with the elevated temperature and the
18   increase in pain and swelling that he had that was
19   not present after the trauma, yes.
20   MR. QUINN:  Let's take a look at the records from
21   2/25/15 from St. Elizabeth's Hospital.  So this will
22   be Exhibit No. 5.
23   (Whereupon, Angarone Exhibit 5 was marked
24   for identification.)

Page 46

1    BY MR. QUINN:
2    Q   Exhibit 5 is four pages of the presentation
3    to the emergency department by Mr. James on 2/25/15,
4    is that correct?
5    A   Yes.
6    Q   And it consists of five pages?
7    A   Yes.
8    Q   Starting with St. Elizabeth's 59 through
9    St. Elizabeth's 63, correct?
10   A   Yes.
11   Q   Now, if you look under history of present
12   illness, do you see that on the first page?
13   A   Yes.
14   Q   So it says the patient complains of left
15   facial swelling for three weeks, right?
16   A   Yes.
17   Q   Is it your opinion that swelling in a facial
18   area for three weeks means that there is an
19   infection?
20   A   For that long, no.  I mean, without any other
21   symptoms indicating infection, no, not in and of
22   itself.
23   Q   So let's say that he's had swelling for three
24   weeks and he has -- well, let's take a look at this

Page 47

1    here.
2    So under conditions present on arrival, it
3    says no conditions present, do you see that?
4    A   Yes.
5    Q   What does that mean to you when you reviewed
6    this -- you did review this?
7    A   Yes, I did.
8    Q   What does that mean to you?
9    A   So that would tell me that either they're
10   looking at what his medical history is or any
11   problems that he has that were present when he came
12   into the ER.  I don't take emergency room
13   documentation, so I don't know what the question was
14   that they asked.
15   Q   Okay.  Give me just a second.
16   Now, at this particular time if you look
17   at under history of present illness right before the
18   section that says conditions present on arrival, it
19   says he has fracture to the orbit, not put on
20   antibiotics, do you see that?
21   A   Yes.
22   Q   Did I read that correctly?
23   A   Yes, you did.
24   Q   Now, this was 2/25 of '15.  Based on your

Page 48

1    review is it true that he was not placed on
2    antibiotics on 2/25/15?
3    A   He was placed on antibiotics two or three
4    days before.
5    Q   Right.  So this statement under history of
6    present illness is not accurate, right?
7    A   Correct.
8    Q   If you look under page 3 of that section here
9    of this document which has the physical exam right at
10   the top, do you see that?
11   A   Yes.
12   Q   And you look under the temperature that was
13   taken at 17:28, what was his temperature?
14   A   98.7.
15   Q   Is that a low grade fever?
16   A   No.
17   Q   That's within normal limits, correct?
18   A   Yes.
19   Q   So that would be inconsistent with an
20   infection at least, right?
21   A   At this time of his presentation, yes, but
22   fevers don't persist all the time, so fevers can come
23   and go.
24   Q   Okay.  But at least at this time he had a

12 (Pages 45 to 48)

MICHAEL ANGARONE MD   7/10/2018

Page 49

1  normal temperature, right?
2     A  At the time of his presentation he had a
3  normal temperature.
4     Q  Okay.  So let's go back to Exhibit No. -- the
5  report, the CT scan report.
6        So we're looking at Exhibit 4, the CT scan
7  report.  On the report it does say there's a possible
8  deep abscess on this date, right?
9     A  Yes.
10    Q  We do know that at that time on 2/25/15 that
11 his temperature was 98.7 at 5:28 p.m., right?
12    A  Yes.
13    Q  So at least that temperature in and of itself
14 is not consistent with an infection?
15    A  At the time that he's presenting to the ER,
16 no, but he had had fevers before.
17    Q  Right.  Now, this says that this is a
18 possible deep abscess measuring 12 millimeters in
19 diameter.
20       Doctor, as you sit here today, can you
21 testify to a reasonable degree of medical certainty
22 in your field of infectious disease that Mr. James in
23 fact had an abscess at the time of his exam?
24    A  Yes, prior to him presenting for this CAT

Page 50

1  scan he had a CAT scan before, so I think five days
2  before, that did not show any of the fluid
3  collection.  It showed soft tissue swelling.  He then
4  subsequently developed fevers before the 25th I think
5  to a temperature max of 102.3 which are all
6  indicative of an abscess.
7     Q  They are consistent with an abscess, right?
8     A  Yes.
9     Q  Is it possible that you can have the sequela
10 of symptoms on presentation and not be an abscess
11 though?
12    A  It could but he has image findings that are
13 pointing towards this being an abscess, and so with
14 his symptoms and his fever, seeing that he has fluid
15 in the deep spaces of the face, one would make the
16 conclusion that he had an abscess.
17    Q  An abscess, okay.
18       Let's go back to your report which is
19 Exhibit No. 3, but before we go do that, I'm sorry,
20 let's go back to that 2/25 visit which is Exhibit
21 No. 5.
22       If you look at page 4 of that exhibit,
23 under white blood cell count, his white blood cell
24 count was what?

Page 51

1     A  10.1.
2     Q  Is that within normal limits?
3     A  Yes, it's the high end of normal.
4     Q  Okay.  So because normal is 4.8 to 10.8
5  according to this particular lab, right?
6     A  Yes.
7     Q  And so his white blood cells were not
8  elevated?
9     A  They were on the high end of normal, so they
10 weren't abnormally elevated but they were on the high
11 end of normal.
12    Q  Okay, fair enough.  They weren't abnormally
13 elevated, and so is this white blood cell count
14 inconsistent with someone who has an infection such
15 as an abscess?
16    A  No, you can still have an infection and have
17 a normal white blood cell count.  So an elevated
18 white blood cell count can be a marker that there's
19 an infection, but it does not always occur
20 100 percent of the time.
21    Q  But you can also have changes in a CT scan
22 such as in this case and not be an abscess as well?
23    A  Correct.
24    Q  So back to your report that you authored,

Page 52

1  which is Exhibit No. 3, and let's go to the second
2  page.  And so looking at 4a, you go through somewhat
3  of the history of the facts in the case, right?
4     A  Yes.
5     Q  Under number 4, and so would these particular
6  facts be the facts you used to render or to conclude
7  your -- or to come up with your opinions?
8     A  Yes.
9     Q  And is there anything outside of this
10 document and outside of these facts that you relied
11 upon in forming your opinions in this case?
12    A  No, I used what's written here.
13    Q  Okay.  So we do know that on January the
14 11th, Dustin was involved in an altercation in the
15 St. Claire County Jail, correct?
16    A  Yes.
17    Q  And he evidently suffered injury to his it
18 looked like the left side of his face, right?
19    A  Yes.
20    Q  Now, he was at that time after the
21 altercation at the jail, he was sent to
22 St. Elizabeth's Hospital, correct?
23    A  Correct.
24       (Whereupon, Angarone Exhibit 6 was marked

13 (Pages 49 to 52)

MICHAEL ANGARONE MD   7/10/2018

## Page 53

1       for identification.)

2   BY MR. QUINN:

3       Q   And if you look at the medical records from

4   St. E's on 1/12/2015, which we'll mark as Exhibit No.

5   6, and I'll give you a chance to look at that, but

6   you would agree with me that at the time of his

7   treatment on January 12, 2015, that he received a CT

8   scan which did show a comminuted left zygomatic arch

9   fracture and possible left orbital fracture, is that

10  correct?

11      A   Yes.

12      Q   Now, when they treated him of course he did

13  receive sutures?

14      A   Yes, he did.

15      Q   And he was not prescribed at that time any

16  antibiotics, right?

17      A   He was not, no.

18      Q   Okay.  Now, so the jail after the altercation

19  promptly sent him out to the ER.  You agree with

20  that, correct?

21      A   Yes.

22      Q   And you have no criticisms of their actions

23  at that time?

24      A   I do not, no.

## Page 54

1       Q   Now, he was also sent to it looks like on

2   January the 16th of 2015 approximately four days

3   after being sent to St. Elizabeth's Hospital he was

4   sent to Quantum Vision Center?

5       A   Yes.

6       Q   And it was pretty much they decided that

7   based on their examination no treatment was required

8   at the time?

9       A   Correct.

10      Q   And they did not prescribe any antibiotics to

11  him?

12      A   No, they did not.

13      Q   On January the 26th, 2015, he was sent to

14  Archview Medical Specialists for an appointment?

15      A   Yes.

16      Q   And he was sent there from the St. Claire

17  County Jail, right?

18      A   Yes, I believe so.

19      Q   And the medical staff there made that

20  referral to this outside medical provider, correct?

21      A   Can you repeat the question, sorry.

22      Q   The medical provider at the center, I mean at

23  the St. Claire County Jail sent him to Archview?

24      A   Yes.

## Page 55

1       Q   And so at Archview he was seen on January 26,

2   2015, and at that point in time they did not provide

3   any type of antibiotic prescription to him, did they?

4       A   They did not.

5       Q   But there was an examination of him?

6       A   Yes.

7       Q   And they determined that they could not

8   perform any treatment on him at that time?

9       A   Correct.

10      Q   All right.  And we do know that on January

11  the 28th he was sent back to Quantum Vision Center,

12  correct?

13      A   Yes.

14      Q   And again he was sent there from the

15  St. Claire County Jail, right?

16      A   Yes.

17      Q   And you realize that the doctor there,

18  Dr. Larson, made that referral to Quantum, correct?

19      A   Yes.

20      Q   And you realize do you agree that every time

21  he was sent out of the St. Claire County Jail that

22  the doctor is the one who has to make that referral

23  out?

24      A   Yes.

## Page 56

1       Q   And that's not Debra Hale?

2       A   Correct.

3       Q   You agree that Debra Hale doesn't have the

4   authority to send him out of the St. Claire County

5   Jail without a doctor's order?

6       A   Correct.

7       Q   So at Quantum Vision Center on January 28th,

8   2015, he's seen.  They determine that the exam is

9   satisfactory and no treatment was required, correct?

10      A   Correct.

11      Q   And they did not prescribe any antibiotics to

12  him at that time?

13      A   No.

14      Q   All right.  So now if you go to February

15  the 19th, according to your report the plaintiff

16  awoke with severe swelling and pain on the left side

17  of his face, right?

18      A   Correct.

19      Q   And where did you get that information?

20      A   That was from I believe the deposition from

21  the plaintiff as well as reading the medical records

22  from the prison.

23      Q   Okay.  And so you're saying that the medical

24  records from the prison documented that he had severe

14 (Pages 53 to 56)

MICHAEL ANGARONE MD   7/10/2018

## Page 57

1  swelling and pain?

2      A  I think he commented on the severe.  I would

3  have to look to see exactly.

4      Q  Okay.  But at least from his deposition he

5  said he had severe swelling on the side of his face?

6      A  Yes.

7          (Whereupon, Angarone Exhibit 7 was marked

8          for identification.)

9  BY MR. QUINN:

10     Q  All right.  I'm going to show you it's the

11  medical progress notes dated February the 19th, 2015.

12  We'll mark this as Exhibit No. 7.  I'll show you

13  that, and I want you to look at the date of February

14  the 19th, 2015, and let me know when you're done

15  reading those two entries.

16     A  Okay.

17     Q  So we do note from this particular note of

18  February 19, 2015, at exactly 0815 --

19     A  This is a different one.

20  MS. FRITZ:  Oh, is it?

21  BY MR. QUINN:

22     Q  Sorry about that, but at 0815 on 2/19/2015 it

23  looks like Debra Hale made a note, correct?

24     A  Yes.

## Page 58

1      Q  And if you read that note it doesn't indicate

2  there that the facial swelling was severe, does it?

3      A  It does not, no.

4      Q  And you can put that to the side.

5          And so we also note in your report that

6  you state that he had difficulty opening the left eye

7  secondary to the swelling, right?

8      A  Yes.

9      Q  And where did you get that information?

10     A  So again I think that was from his

11  deposition.

12     Q  Okay, from his deposition.  Do you know if

13  you reviewed that anywhere else in the records?

14     A  I do not recall, no.

15     Q  Okay.

16     A  On the SLU Care there was left eye pain.

17     Q  What date was that?

18     A  That was 2/20.

19     Q  We'll get to that in a second.

20         And you do note in your report that on

21  that date of February 19th, 2015, there was somewhat

22  of a -- strike that.  The plaintiff became angry?

23     A  Yes.

24     Q  Because he didn't have a prescription for

## Page 59

1  pain medications at that time, right?

2      A  Yes.

3      Q  And at that time Ms. Hale placed him on the

4  M.D. line so he could be seen to receive a

5  prescription for pain medication?

6      A  Yes.

7      Q  Do you have any criticisms of Ms. Hale for

8  that action?

9      A  No.

10     Q  Okay.  Now, the very next day -- so he

11  presents on February 19th.  He's wanting pain

12  medications.  He becomes upset when Ms. Hale tells

13  him that he didn't have a prescription so she could

14  not give the medicine without an M.D. prescription,

15  is that a fair description of the event?

16     A  Correct.

17     Q  And you do agree that Ms. Hale as a nurse

18  cannot give out prescription medication, correct?

19     A  Correct, without a physician's order.

20     Q  So on the very next day he's seen at SLU Care

21  Plastic Surgery clinic, right?

22     A  Correct.

23  MR. QUINN:  Let's get that record out.  We'll

24  mark that as Exhibit No. 8.

## Page 60

1          (Whereupon, Angarone Exhibit 8 was marked

2          for identification.)

3  BY MR. QUINN:

4      Q  So he's seen at SLU Plastic Surgery on the

5  day after the verbal altercation took place, right?

6      A  Correct.

7      Q  Doctor, do you know when this appointment was

8  made?

9      A  It seems looking through the records that it

10  was a scheduled appointment, but I do not know when

11  it was made.

12     Q  Okay.  So can we agree that this appointment

13  was made ahead of time of the 20th?

14     A  Yes.

15     Q  And so by the time he came on the 19th the

16  medical appointment to SLU had already been

17  scheduled?

18     A  Yes.

19     Q  And so he's seen by a Dr. Bruce Kraemer at

20  SLU, correct?

21     A  Yes.

22     Q  Now, we're looking at Exhibit No. 8.  These

23  are the medical records from the SLU Care

24  appointment, and it looks like we have a total of --

15 (Pages 57 to 60)

MICHAEL ANGARONE MD  7/10/2018

## Page 61

1   there are ten pages, I'm sorry, eleven pages of
2   medical records and I believe you have an
3   authorization before the records?
4   .   A  Yes.
5   Q  So if you start from the records and go to
6   the last page it should be eleven pages of records,
7   right?
8   A  Yes.
9   Q  Is there a page after that eleventh page?
10  A  No.
11  Q  So he's seen on the 20th by Dr. Kraemer, and
12  if you look at page 4 of the medical records in that
13  Exhibit No. 8 --
14  A  Yes.
15  Q  -- you'll see that they did see him on
16  2/20/2015, and he was examined by Dr. Kraemer along
17  with his resident, correct?
18  A  Yes.
19  Q  And so they took his temperature, and at that
20  time his temperature was 100 degrees Fahrenheit?
21  A  Yes.
22  Q  And I think you described that as a low grade
23  temperature, correct?
24  A  Yes.

## Page 62

1   Q  And they also noted that swelling -- there
2   was swelling on his left cheek area which was tender,
3   right?
4   A  Yes.
5   Q  Now, they also note though, however on exam
6   that there was no overt evidence of infection aside
7   from the swelling, right?  I mean, that's what's
8   contained on the record, no overt evidence of
9   infection aside from swelling?
10  A  I'm just trying to see where.
11  Q  Sure, take your time.  Is that a true
12  statement?
13  A  That's what they say.
14  Q  Do you agree with that statement?
15  A  Again, I don't know what they're looking at
16  or what they're commenting on of no overt because
17  they do see swelling.  So he had swelling and he has
18  tenderness in that area, so in terms of no overt, I
19  don't know what they're commenting on or what they're
20  trying to put forth there.  So I can't interpret what
21  they're meaning by no overt evidence of infection.
22  Q  Doctor, can tenderness along with swelling
23  result from trauma absent an infection?
24  A  It can, yes.

## Page 63

1   Q  And so it also states under assessment where
2   it says diagnostic imaging unavailable, was sent for
3   computed tomography scan, do you see that?
4   A  Yes.
5   Q  So at the time they saw him initially there
6   was no CT scan at that time done?
7   A  At the exact time -- at the time of the
8   visit, no.
9   Q  Right, at the time of the visit, no.  Okay,
10  so now if you look down further on that same page.
11  A  Page 4?
12  Q  Yes, sir.  There is an addendum, right?  Do
13  you see that under plan?
14  A  Yes.
15  Q  Okay.  In your review of this particular
16  document, what is your understanding of this
17  particular section, this addendum section to be?
18  What is that?
19  A  Can you reframe the question?  I don't
20  understand what you're asking.
21  Q  So what is an addendum to a medical record?
22  A  Okay.  So an addendum would be if I were to
23  write a note at the time that I see a patient and
24  then if data becomes available or information becomes

## Page 64

1   available after I've seen the patient that alters my
2   initial plan.  So if I have initial plan A but I get
3   a lab test back or an imaging test or a call from the
4   patient that changes what my plan for A is, an
5   addendum might entail what now I want to do based on
6   this information or an addendum might be just
7   updating the patient on what the information was from
8   the lab test.  So it's just a way to document that,
9   yes, I viewed or I'm aware of new information and
10  I've made the patient available or aware or at least
11  I'm aware of what's going on.
12  Q  In your review of this particular medical
13  record from SLU Care and the addendum section
14  specifically as well as your review of other
15  documents, can you explain what caused this
16  particular provider to add an addendum to this
17  record?
18  A  So to me from reading this it seems that when
19  the provider reevaluated the temperature, the pain
20  and swelling as well as some of the findings on the
21  CAT scan with some edema of the soft tissues, he was
22  worried that there may be an infection that is there
23  on the face or within the area of the fracture and
24  wanted to act on that and so he recommends starting

16 (Pages 61 to 64)

MICHAEL ANGARONE MD   7/10/2018

## Page 65

1    or wants to start an antibiotic.
2    Q   So would you agree that it appears from the
3    record that the CT scan was done after the patient
4    had already been seen?
5    A   Yes, so it seems like the provider, this
6    provider saw the patient with one of his residents
7    and then recommended that day, so right after they
8    were done seeing him, that he get a CT scan of his
9    face to evaluate the fracture and what might be going
10   on with the face, and then the addendum was after
11   evaluation of that procedure.  That's the way that I
12   would interpret this.
13   Q   Let's read this into the record.  I'll read
14   it, if you don't mind, and if you just follow along
15   with me and make sure I am reading it correctly the
16   addendum section on page 4 of Exhibit No. 8.
17         It says computed tomography scan shows
18   minimally displaced zygomaticomaxillary fracture, is
19   that right?
20   A   Yes.
21   Q   Okay.  Probably wasn't pretty but I got
22   through it.
23         We'll see the patient back in two weeks
24   and says his swelling of healing at that time.

## Page 66

1    That's what it says, right?
2    A   Yes.
3    Q   Further it goes on to state that please see
4    resident's note for further details.  We had wanted
5    the patient to return to clinic after his scan but he
6    failed to do so.  Given the paucity of radiographic
7    findings, his swelling in his temperature, I called
8    the jail where he is residing.  I left a message with
9    the medical department that I would recommend putting
10   him on Cipro 500 milligrams twice daily and I gave
11   them my cell number to call me over the weekend if
12   they have questions, and we will try to reach them
13   again Monday morning.
14         Did I read that correctly?
15   A   Yes.
16   Q   And the name underneath this particular note
17   is Bruce Kraemer, correct?
18   A   Yes.
19   Q   Now, it appears here that the -- do you agree
20   that when the patient received his CT scan that he
21   did not return to the clinic to see Kraemer,
22   Dr. Kraemer?
23   A   That's what it seems like from what the
24   documentation states.

## Page 67

1    Q   And because of that the patient was sent back
2    to the jail and Dr. Kraemer then wanted to put him on
3    Cipro 500 milligrams, right?
4    A   Yes, yes.
5    Q   And so you would agree that when he was
6    originally sent back to the jail he did not have a
7    prescription for Cipro?
8    A   Correct.
9    Q   Now, do you also understand, Doctor, that
10   February the 20th, 2015, was a Friday?
11   A   That's what I ended up understanding from
12   reading the records and from his note.
13   Q   Right.  So that's why he says that he must
14   have called later and he left a message with the
15   medical department, right?  That's what the medical
16   record says, correct?
17   A   Yes.
18   Q   And then he says I will follow up on Monday
19   morning as well, right?
20   A   Yes.
21   Q   Doctor, do you have any criticisms of
22   Dr. Kraemer for seeing Mr. James and sending him back
23   to the jail without a prescription for Cipro and
24   before reviewing his CT scan that he got on him?

## Page 68

1    A   So from reading the records by Dr. Kraemer,
2    he wanted to see him back.  So why Mr. James did not
3    come back to see him after the CAT scan, I don't
4    know.  I'm not aware of why that occurred, but the
5    actions that Dr. Kraemer was taking with getting the
6    CAT scan and then wanting to reevaluate Mr. James,
7    and then again he sees the CAT scan, looks at what
8    the patient's symptoms were and his vital signs were
9    when he was initially seen, he decides that, well, he
10   may have an infection so we should treat this with
11   the low grade fever as well as the elevation in
12   pulse, so his pulse was 115, and also the findings on
13   the CAT scan where there were some soft tissue
14   swelling.
15         But, again, I don't know why the patient
16   did not come back to see him in the clinic.  I don't
17   know if it was Dr. Kraemer who discharged the patient
18   back, but based on the records, Dr. Kraemer wanted to
19   see him back after the CAT scan.
20   Q   Of course it wasn't Debra Hale who caused the
21   patient to be sent back to the jail before going back
22   to the clinic?
23   A   I'm not aware of who called him back.
24   Q   Okay.  So based on information you know to

17 (Pages 65 to 68)

MICHAEL ANGARONE MD  7/10/2018

## Page 69

1   date, you don't criticize Debra Hale -- you don't
2   have any criticisms of Debra Hale because this
3   patient left Dr. Kraemer's clinic or left from SLU
4   Care after receiving a CT scan and went back to jail,
5   do you?
6       A  No, I do not.
7       Q  So let's look at that CT scan.  Let's look at
8   page 5, and page 5 at the bottom it talks about CT
9   facial bones, do you see that?
10      A  Yes.
11      Q  And you would agree that's the CT scan that
12  was done -- well, you know what, strike that.
13          Let's go to page 10 of that report.
14      A  Okay.
15      Q  So in this report there is no mention here of
16  an abscess, is there?
17      A  There is not, no.
18      Q  Is there anything in this report that even
19  talks about findings that there could be a possible
20  abscess?
21      A  No, there is not.
22      Q  And so what they see to the left cheek is
23  simply soft tissue swelling, correct?
24      A  Yes.

## Page 70

1       Q  And you would agree that based on the finding
2   and given Dr. Kraemer's note, the Cipro was
3   prescribed really out of an abundance of caution in
4   case there was an infection?
5       A  Well, I think he had the low grade
6   temperature, the increased pulse rate, the pain that
7   he was having at the side of the face and then the
8   CAT scan does show as well as their exam the swelling
9   that he has, and so there's soft tissue swelling
10  which could be indicative of a soft tissue infection,
11  and so when you put those together, that would be the
12  reason to give the Ciprofloxacin.
13      Q  Right.  So let's go to your report here which
14  is -- let's go to the third page of your report.
15  Actually, let's just look at letter D of your report.
16  I'm going to start reading the last sentence of that
17  paragraph.  It says the plaintiff did not return to
18  the clinic after his CT scan.  Did I read that
19  correctly?
20      A  Correct.
21      Q  It says Dr. Kraemer reviewed the CT scan, the
22  exam and the elevated temperature and called a
23  prescription for Ciprofloxacin 500 milligrams twice
24  per day to the St. Claire County Jail.  Did I read

## Page 71

1   that correctly?
2       A  Yes.
3       Q  Now, you do realize he called after the
4   patient already left for the jail?
5       A  Yes.
6       Q  And that when the patient left from the
7   particular clinic or from the SLU Care area and after
8   receiving a CT scan he did not have a prescription
9   for Cipro, did he?
10      A  He did not, no.
11      Q  And you do understand this was a Friday,
12  February the 20th, 2015, right?
13      A  Yes, based on reading the records, yes.
14      Q  Now, he said he called and left a message
15  with the medical department.  Do you know who he
16  called or what number he called?
17      A  I do not, no.
18      Q  You do realize that the medical department is
19  open all hours of the day and night at the St. Claire
20  County Jail?
21      A  I'm not aware of that.
22      Q  You don't have a reason to disagree with
23  that, right?
24      A  I do not, no.

## Page 72

1       Q  And if I wanted to call the St. Claire County
2   Jail now I could call the medical department right
3   now, right?  You don't have any reason to disagree
4   with that?
5       A  I don't have any reason to disagree with
6   that, no.
7       MR. QUINN: Can we take like a five-minute break
8   right there?
9       THE WITNESS:  Sure.
10         (Recess.)
11  BY MR. QUINN:
12      Q  All right.  So according to Dr. Kraemer's
13  note, he did call the facility to leave a message at
14  the medical department at the jail, right?
15      A  Yes.
16      Q  Now, you don't know what number he called,
17  correct?
18      A  I have no idea.
19      Q  You never heard the message he left or
20  anything, right?
21      A  No, I didn't.
22      Q  As a matter of fact, other than reading his
23  note, you don't even know if he did in fact call the
24  jail, do you?

MICHAEL ANGARONE MD   7/10/2018

## Page 73

1    A   From the note I can't tell that, but there's
2    an answer or someone does get the voicemail I think
3    on Monday from reading the records.
4    Q   On Monday, and this was over the weekend.
5    The date of February 20th I think we said was a
6    Friday, right?
7    A   Yes.
8    Q   Okay.  And we don't know from reading this
9    record what number he dialed, right?
10   A   No.
11   Q   And he also indicated that he would call
12   again Monday morning, all right, is that right?
13   A   Correct.
14   Q   And let me ask you this.  So are you
15   criticizing Debra Hale for the patient being sent
16   back to jail without a prescription for Cipro?
17   A   No.
18   Q   Okay.  What is your criticism of Debra Hale
19   during this particular circumstance where the patient
20   is sent back to jail without a prescription for
21   Cipro?
22   A   So I don't believe it was Debra Hale's
23   responsibility, you know, with getting him back to
24   the jail or sending him back to the jail.  It was the

## Page 74

1    fact that the message got sent from Dr. Kraemer to
2    the prison.
3    Q   You're assuming that?
4    A   So based on -- so the fact that the message
5    was actually listened to on February 23rd and then
6    his antibiotics were given to him, and so no one
7    looked at or listened to the messages or reviewed any
8    messages that might have been sent over the weekend
9    by this physician, by Dr. Kraemer.
10   Q   And we don't know what number he called, do
11   we?
12   A   Do not, no.
13   Q   Do we know who retrieved the -- strike that.
14   Let me ask you this.
15       You just stated that a message was
16   retrieved on Monday?
17   A   On February 23rd, yes.
18   Q   And where did you see that?
19   A   I would have to look to see where that was
20   documented.
21   Q   Okay.  Well, you can take a look at your
22   notes and see.
23   A   I think it was Debra Hale's deposition.
24   There was a comment the message was not checked until

## Page 75

1    Monday, so inmate did not get Cipro until February
2    22nd or 23rd.  Call received by plastics on 2/23 to
3    give Cipro.
4    Q   Do you understand what Debra Hale's position
5    was at the jail?
6    A   She was the nurse.  I believe she was the
7    charge nurse or the nurse manager of the jail.
8    Q   Okay.  And let's assume that Ms. Hale had a
9    separate line from the line to the medical
10   department.  Let's just assume that for this
11   question, and let's also assume that the doctor
12   called Debra's direct line on this Friday after this
13   appointment sometime and not the number to the
14   medical department.  Are you critical of Debra Hale
15   for not receiving a message on her direct line on
16   that Friday when she was gone from the facility?
17   A   If it was to her direct line, so I don't know
18   how often her direct line is checked or I don't know
19   how these numbers are handled or where the messages
20   go.  So if it was her direct office line and she's
21   not there over the weekend, she's not going to
22   receive the message, but then I would ask why does
23   Dr. Kraemer have her direct line and not the line to
24   the jail infirmary to give a general message because

## Page 76

1    I don't know what number he is calling or how he gets
2    the numbers.
3    Q   That's a good point.  Do you have knowledge
4    that the St. Claire County Jail's medical department
5    is open 24 hours a day, seven days a week?
6    A   I do not, no.  I don't know what their hours
7    of operation are.
8    Q   Okay.  So let's assume that the medical
9    department is open 24 hours a day, seven days a week,
10   and there is a number that you can call into the jail
11   or a direct number you can call to the medical
12   department, and in this particular case that number
13   was not called but the number of -- but the extension
14   directed to Debra Hale was when she was not at work.
15   Considering those facts or that hypothetical, would
16   you be critical of Debra Hale?
17   A   If the message went to her private number
18   then I would not be, no.
19   MR. QUINN:  Okay.  I want to take a look at
20   another exhibit we will mark which is Exhibit No. 9.
21       (Whereupon, Angarone Exhibit 9 was marked
22       for identification.)
23   BY MR. QUINN:
24   Q   All right.  This is a group exhibit

19 (Pages 73 to 76)

MICHAEL ANGARONE MD   7/10/2018

## Page 77

1  consisting of three pages.  The first page of this
2  Group Exhibit 9 are nurses' notes.  The first date is
3  2/23/2015 at 11:20.  Do you see that note at the top
4  there, Doctor?
5     A.  Yes.
6     Q.  And it's the medical progress notes for
7  Dustin James, correct?
8     A.  Yes.
9     Q.  And on this note of February 23rd, 2015, at
10  11:20 it states received call from Dr. Kraemer's
11  office?
12     A.  Yes.
13     Q.  Something recommends?
14     A.  It.
15     Q.  It?
16  MS. FRITZ:  I think that's and.
17  BY MR. QUINN:
18     Q.  Okay.  And it recommends Cipro 500 milligrams
19  PO BID times ten days related to, that's R slash T,
20  CT scan.  Did I read that correctly?
21     A.  Yes.
22     Q.  And so this is the Monday after the Friday he
23  was seen, correct?
24     A.  Yes.

## Page 78

1     Q.  Now, if you look at the second page, this
2  second page states this is Wexford Health Sources
3  physician order form, is that right?
4     A.  Yes.
5     Q.  And if you look at -- and this is for Dustin
6  James, right?
7     A.  Yes.
8     Q.  If you look at the next to last entry, there
9  is a script for Cipro 500 milligrams BID times ten
10  days, telephone order, Dr. Larson and then there's a
11  nurse's name right after that, is that right?
12     A.  Yes.
13     Q.  Do you see that?
14     A.  Yes.
15     Q.  Do you agree with that?
16     A.  Yes.
17     Q.  Now, it says that if you look to the left,
18  the date is 2/23/2015?
19     A.  Correct.
20     Q.  All right.  If you look at the next page --
21  hold on just a second here.
22         If you look at the next page, this is a
23  medication administration record for Dustin James,
24  right?

## Page 79

1     A.  Yes.
2     Q.  And the Cipro 500 milligrams PO BID it looks
3  like it was given on the 23rd at 9:00 p.m., right,
4  2100?  Do you see a signature on the 23 number at
5  2100?
6     A.  Yes.
7     Q.  Okay.  So --
8     A.  Yeah, I'm just trying to -- there's the 09
9  and then the 21.
10     Q.  Right.  So their BID time was 9:00 in the
11  morning and 9:00 at night?
12     A.  Yes.
13     Q.  So you would agree that they received the
14  call from Dr. Kraemer's office on February 23rd,
15  2015, for the script for Cipro 500 milligrams by
16  mouth twice a day for ten days, right?
17     A.  Yes.
18     Q.  The order -- there's a prescription that was
19  written on the same day per telephone order from
20  Dr. Larson and that medication, Cipro 500 milligrams,
21  was given that same day, right?
22     A.  Yes.
23     Q.  Do you agree that that was a reasonable time
24  to receive that call, input the order and administer

## Page 80

1  the first dosage to Dustin James?
2     A.  For that day, yes.
3     Q.  For that day, right.  So you're not critical
4  of them delaying any type of administration of the
5  medication from the time they received the call from
6  Dr. Kraemer's office on Monday the 23rd of February,
7  2015, correct?
8     A.  No.
9     Q.  All right, thanks.
10         Let's go back to your report.  So we're on
11  the third page of your report.  Let's go to letter G.
12  We already talked about the February 25th, 2015
13  appointment.  Let's go to letter G.
14         It says on March 2nd, 2015, the plaintiff
15  was again seen at SLU Care by plastic surgery, and I
16  want to take a look at that which is Exhibit -- the
17  SLU Care records are Exhibit No. 8 and I'll hand this
18  back to you.
19         Let's go to I believe page 9.  Please let
20  me know when you're there.
21     A.  I'm there.
22     Q.  Now, you say he was seen.  Based on these
23  records this was simply a telephone encounter, right?
24     A.  Okay, yeah, it appears to be, yes.

20 (Pages 77 to 80)

MICHAEL ANGARONE MD 7/10/2018

## Page 81

1    Q  So he was not seen.  He called there and the
2  call was returned to him, is that right?
3    A  Yes.
4    Q  All right.  And so reading the records on
5  March 2nd, 2015, at 1:20 p.m. he called -- it says
6  patient called and wanted to know if he could have an
7  antibiotic called in.  His number is (618) 381-6640.
8  Did I read that correctly?
9    A  Where is that at, sorry?
10    Q  I'm sorry, page 9, are you there?
11    A  Is it at the bottom?
12    Q  In the middle there.
13    A  Oh, okay, sorry.
14    Q  So you see in the middle it says telephone
15  encounter by Lori M. Betts at 3/2/2015 at 1:20 p.m.?
16    A  Yes.
17    Q  And I just read what that telephone encounter
18  stated, correct?
19    A  Yes.
20    Q  Also according to the notes, if you look at
21  the top where it says telephone encounter by Oliver
22  Deigni, M.D., at 3/2/2015, 2:18 p.m., do you see
23  that?
24    A  Yes.

## Page 82

1    Q  Underneath that telephone encounter it states
2  that the patient states he was in jail for a week
3  after seeing us in the clinic on 2/20/2015, right?
4    A  Yes.
5    Q  He was released and he went to
6  St. Elizabeth's Hospital due to significant swelling
7  in his left face to the point where he could not eat
8  and had to be placed on a liquid diet.  They repeated
9  a CT scan which showed an abscess.  He was given a
10  ten-day prescription of Augmentin and has now taken
11  three days' worth.  He notes good improvement of his
12  swelling.  He denies any fevers and chills and states
13  he still has some blurry vision out of the left eye.
14  I recommend he complete his antibiotics and come to
15  our clinic as soon as possible with his CT scan on a
16  CD.  We will evaluate him at that time.
17       Did I read that correctly?
18    A  Yes.
19    Q  So he was not seen.  He simply called and --
20    A  Right, that was my mistake.
21    Q  And so at that point there was no antibiotics
22  prescribed to him at that time, right?
23    A  He was continuing the antibiotics he got at
24  St. Elizabeth's, so they gave him the Augmentin.  So

## Page 83

1  he was on Cipro and then they gave him Augmentin at
2  St. Elizabeth's.
3    Q  And the recommendation was complete those
4  antibiotics?
5    A  Yes.
6    Q  Do you have any understanding from your
7  review or otherwise the reason the patient called SLU
8  Care on 3/2 to receive an antibiotic when he was
9  already on antibiotics?
10    A  I do not, no.
11    Q  Okay.
12    A  Without knowing what the patient said I don't
13  know what he was exactly requesting.
14    MR. QUINN:  All right.  Now, he was again seen at
15  St. Elizabeth's Hospital it looks like on March 21st,
16  2015.  We'll mark that as Exhibit No. 10.
17       (Whereupon, Angarone Exhibit 10 was marked
18        for identification.)
19  BY MR. QUINN:
20    Q  All right.  We marked as Exhibit 10 the
21  St. Elizabeth's Hospital emergency room records of
22  March 21, 2015, which consists of three pages, is
23  that correct, Doctor?
24    A  Yes.

## Page 84

1    Q  Now, apparently looking at this record you
2  would agree that the patient presented to
3  St. Elizabeth's Hospital ER on this date, right?
4    A  Yes.
5    Q  Now, under history of present illness, it
6  looks like it says patient here for complaints of
7  left facial pain and swelling, states had facial
8  fractures and then got infected, was treated here at
9  that time, was feeling better, but for two days now
10  feels like face pain and swelling coming back.
11  Denies n/v/f/c, I believe that's nausea, vomiting,
12  fever and chills?
13    A  Correct.
14    Q  Has appointment with SLU Clinic on 30th for
15  follow-up.  Patient worried about infection coming
16  back.  Requesting antibiotics and pain medication.
17  No swelling noted on exam and patient left face
18  without redness.
19       Did I read that correctly?
20    A  Correct.
21    Q  So they noted that there was no swelling
22  noted on exam and his left face was without any
23  redness, correct?
24    A  Correct.

21 (Pages 81 to 84)

MICHAEL ANGARONE MD  7/10/2018

Page 85

1    Q   And those signs would be inconsistent with an
2    infection, correct?
3    A   On his presentation, yes.
4    Q   Right.  If you look at page 2, his
5    temperature was 98.1, right?
6    A   Yes.
7    Q   Okay.  So that's not a sign of infection, is
8    it?
9    A   No.
10   Q   Okay.  And based on this record and your
11   review of this record and other documents -- well,
12   strike that.  Strike that.
13         At the time of February 19, 2015, when the
14   patient presented to the medical unit at St. Claire
15   County Jail requesting pain medications, you would
16   agree that his medical condition at that time was not
17   a medical emergency?
18   A   Based on the information, no.
19   Q   Right.  And you would agree with that?
20   A   Yes.
21   Q   That it was not --
22   A   It was not a medical emergency.
23   Q   Okay.  Let's take a look at number 7 of your
24   report which is the last page of your report.  So

Page 86

1    this is a case in which you've given a deposition?
2    A   Yes.
3    Q   And what year was this case?
4    A   That was 2014, I believe.
5    Q   And this was for the defendant or the
6    plaintiff?
7    A   Defendant.
8    Q   And what did this case involve?
9    A   It involved the development of an infected
10   surgical site and decubitus ulcer in an individual
11   who was sent to a nursing home after a surgery or a
12   nursing facility after a surgery.
13   Q   Okay.  And so you would agree that the
14   prescribing of Cipro 500 milligrams by Dr. Kraemer on
15   February 20th, 2015, was not for a medical emergency?
16   A   It was for an infection, and any infection is
17   an urgency.  You want to treat infections as soon as
18   you identify them.  So it wasn't a medical emergency
19   in the fact that he wasn't bleeding from a wound, but
20   he had an infection.  He had a low grade fever.  He
21   had tachycardia.  He had pain, and on imaging and
22   exam he had swelling of that face.  That could all be
23   consistent with an infection of the skin, and so I
24   would argue that treating an infection as soon as

Page 87

1    possible is a medical emergency or a medical urgency.
2    You want to treat that infection as soon as you
3    identify it.
4    Q   So you're saying that the infection, let's
5    assume that this was in fact an infection that the
6    plaintiff had, that this was a medical emergency?
7    A   Well, it's a medical urgency.  You need to
8    treat that as soon as possible.
9    Q   And I totally follow you with that, but the
10   question is was it a medical emergency?
11   MR. PRENGAMAN:  It's been asked and answered.
12   BY MR. QUINN:
13   Q   You understand what a medical emergency as a
14   doctor is, right?
15   A   Yes.
16   Q   A medical emergency is something that 911
17   needs to be called.
18   A   So it's not a medical emergency in that
19   definition.  It's a medical urgency.  It needs to be
20   treated as soon as possible.
21   Q   So the fact that according to the note by
22   Dr. Kraemer that he left a message that he would call
23   back Monday, does that indicate to you that he felt
24   that maybe they would not get his message on Friday?

Page 88

1    MR. PRENGAMAN:  Objection, form.  Go ahead.
2    THE WITNESS:  I don't know what he was thinking
3    in terms of his wording of leaving a message and that
4    I would call again on Monday, so I can't interpret
5    what he was thinking by writing that in the note.
6    BY MR. QUINN:
7    Q   Now, you have not physically examined
8    Mr. James yourself, correct?
9    A   I have not, no.
10   Q   So all of your opinions are based on your
11   review of the medical records and the items we
12   discussed in number 3 of your report, correct?
13   A   Correct.
14   Q   And, Doctor, you don't have opinions with
15   regard to Mr. James' prognosis, do you?
16   A   I do not, no.
17   Q   Okay.  Doctor, have we covered all of your
18   opinions that you have in this case?
19   A   Yes.
20   MR. QUINN:  All right.  I don't have anything
21   else, Matt, at this point.
22   MR. PRENGAMAN:  Okay, I have a couple.
23   MR. QUINN:  All right.
24

22 (Pages 85 to 88)

MICHAEL ANGARONE MD  7/10/2018

Page 89

EXAMINATION
BY MR. PRENGAMAN:
1
2
3    Q   Doctor, at the beginning of the deposition
4    you talk about skin versus internal abscess, is that
5    the correct terminology?
6    A   Yes, or cutaneous versus internal, cutaneous
7    being skin.
8    Q   Are the swelling of body parts indicative of
9    an abscess?
10   A   It can be, yes.
11   Q   Skin or internal or both?
12   A   Both.
13   Q   What about is it typical or standard or I
14   guess within the realm of normal possibilities for
15   swelling to come and go when associated with an
16   abscess or rather, I'm sorry, caused by an abscess?
17   A   Typically the swelling will progress, and
18   when it regresses it's usually that the abscess is
19   resolving or going away.
20   Q   In your review of the records, your opinion
21   and your testimony here today, did you see anything
22   that led you to believe that Nurse Hale referred the
23   plaintiff to a doctor for any swelling in his face?
24   A   I did not, no, other than the appointment

Page 90

1    that he had on the 20th.
2    Q   But do you see anything that led you to
3    believe that Nurse Hale made that appointment in
4    response to the plaintiff's request for medical care?
5    A   I did not, no.
6    Q   In your review of the medical records, did
7    you see anything that would indicate to you that the
8    plaintiff, Dustin James, had the ability to see a
9    doctor without being referred to one from a nurse?
10   MR. QUINN: Objection to the form of the
11   question.
12   THE WITNESS: I was not able to make that opinion
13   based on my review of the records.
14   BY MR. PRENGAMAN:
15   Q   For Exhibit 7, it's the February 19th, 2015
16   medical progress note.
17   A   Yes.
18   Q   And it was discussed that Nurse Hale had
19   signed it, correct?
20   A   Yes.
21   Q   Okay. And Nurse Hale in fact wrote in
22   regards to Dustin James, the plaintiff, does have
23   noted facial swelling, do you see that?
24   A   Yes.

Page 91

1    Q   You don't know what Nurse Hale meant by
2    noted, do you?
3    A   No, I do not.
4    Q   It could mean a minor swelling?
5    A   Yes.
6    Q   It could mean a severe swelling?
7    MR. QUINN: Objection, form, calls for
8    speculation.
9    THE WITNESS: Yes.
10   BY MR. PRENGAMAN:
11   Q   You were asked and you answered you don't
12   know what phone number Dr. Kraemer called at the jail
13   in regards to Dustin James, is that correct?
14   A   I do not, no.
15   Q   Do you have any reason to know why
16   Dr. Kraemer would have gotten Nurse Hale's direct
17   line if such a line exists other than from Nurse
18   Hale?
19   A   I do not know.
20   Q   Would you find fault in Ms. Hale for giving
21   Dr. Kraemer her direct line and then failing to check
22   her messages over the weekend?
23   MR. QUINN: Objection to form of the question.
24   It assumes facts that are not in -- well, just

Page 92

1    objection to form of the question, calls for
2    speculation.
3    THE WITNESS: If that's the number that
4    Dr. Kraemer had, it would be Ms. Hale's
5    responsibility to check that message and follow up
6    the recommendations.
7    BY MR. PRENGAMAN:
8    Q   And it is your opinion as you sit here today
9    that if Dustin James had seen a doctor on
10   February 19th, 2015, that would have resulted in an
11   earlier identification of the abscess that developed
12   on the left side of his face, is that correct?
13   A   It would have resulted in earlier
14   identification of an infection that was developing
15   and earlier implementation of therapy for that
16   infection.
17   MR. PRENGAMAN: No further questions.
18   MR. QUINN: Just one follow-up -- well, one topic
19   for follow-up.
20   FURTHER EXAMINATION
21   BY MR. QUINN:
22   Q   So is it your opinion that if Dr. Kraemer
23   called Debra Hale on her direct line that it was
24   Ms. Hale's fault?

23 (Pages 89 to 92)

MICHAEL ANGARONE MD  7/10/2018

| Page 93 | Page 95 |

**Page 93**

1    A  So I would want to know why Dr. Kraemer had
2  her direct line as opposed to a direct line to the
3  medical infirmary, to the jail's infirmary.  If the
4  only number he had was Ms. Hale's direct line and he
5  was calling that number and that number had medical
6  messages left on it for medical care, it would be her
7  responsibility to follow up on those.  I don't know
8  what the answering system states or I don't know what
9  the message states, whether this is a private line,
10  do not leave any messages for medical care, but if
11  Dr. Kraemer had that number and that was the number
12  that he was calling then leaving a message regarding
13  medical care for one of the inmates, it would then be
14  the responsibility for Ms. Hale or someone to answer
15  that line after hours knowing that there may be calls
16  coming into that.
17    Q  So you don't know the process by which the
18  jail receives or responds to messages left on
19  telephone lines, correct?
20    A  I do not, no.
21    Q  You don't know if in fact Dr. Kraemer called
22  Ms. Hale's direct line how he received that number,
23  correct?
24    A  I do not, no.

**Page 94**

1    Q  You do realize that Debra Hale did not
2  accompany Dustin James to see Dr. Kraemer?
3    A  Correct.
4    Q  And so you're stating it's her responsibility
5  to check her messages, but you never worked in a
6  jail, right?
7    A  I did not, no.
8    Q  You never worked as a nurse manager in a
9  medical unit in a jail, did you?
10    A  No.
11    Q  And you don't have any expertise as to what
12  the policies and procedures are in a medical unit in
13  a jail, do you?
14    A  I do not, no.
15    Q  Now, do you know what time Dr. Kraemer left
16  the message on this particular --
17    A  I do not, no.
18    Q  If I told you 6:42 he left the message on a
19  phone line and that's the time on a Friday evening
20  that Ms. Hale was not at work, would you have
21  criticisms of Ms. Hale for not receiving that message
22  left by Dr. Kraemer while she was already gone from
23  her job?
24    A  So she would be gone, but I would want to

**Page 95**

1  know why Dr. Kraemer was calling a nonmedical care
2  line versus someone's personal line.
3    Q  Okay.  So as we sit here today you don't know
4  why Dr. Kraemer would have called Debra Hale's direct
5  line?
6    A  I do not, no.
7    Q  And so because you don't know why he called
8  and you don't know how he got the number then you
9  really don't have an opinion as to criticisms of
10  Debra Hale in that regard?
11    MR. PRENGAMAN:  It mischaracterizes testimony.
12    THE WITNESS:  So if she's getting phone calls or
13  messages on her personal business line related to
14  patient care, there should be a way to follow up on
15  those messages in a timely manner.
16  BY MR. QUINN:
17    Q  Do you know -- but what if she didn't give
18  Dr. Kraemer the number?
19    A  Again, I don't know how he got her number.
20    Q  So you would agree that even if she's
21  receiving, in this case received a call from
22  Dr. Kraemer at 6:42 p.m. on her direct line, okay, we
23  don't know, let me think about this, why
24  Dr. Kraemer called that line, do we?

**Page 96**

1    A  No.
2    Q  We don't know if it's custom and practice for
3  providers to call that line and leave orders for
4  prescription medications, do we?
5    A  Do not know.
6    Q  And do you realize that the St. Claire County
7  Jail a number can be found if you Google the number,
8  did you know that?
9    A  I did not, no.
10    Q  You wouldn't be surprised by that?
11    A  It wouldn't surprise me, but I don't know.
12    Q  Do you agree that Dr. Kraemer once receiving
13  a voicemail could have called the St. Claire County
14  Jail and asked for the medical unit, couldn't he?
15    MR. PRENGAMAN:  Objection.
16    THE WITNESS:  Again, I don't know the processes.
17  I would assume that he could, but I don't know.
18  BY MR. QUINN:
19    Q  So you don't know the processes, right?
20    A  No.
21    Q  But you don't agree that you can Google the
22  St. Claire County Jail's number?
23    A  I'm sure you can.
24    Q  And as a doctor if you were in the situation

24 (Pages 93 to 96)

MICHAEL ANGARONE MD  7/10/2018

## Page 97

1   of Dr. Kraemer, would you have left the message or
2   would you have called the medical unit and got a live
3   person?
4      A  If I had a phone number that was there with
5   the patient that I was seeing, I would call that
6   phone number.  If that phone number went to a
7   personal line, I would expect, because I had that
8   number for that individual, I would expect that the
9   voicemail would say if this is for medical purposes
10  or regarding patient care, please call this number in
11  that voicemail because that would prompt me to call
12  the actual medical line.
13        If there's a message that's there, I may
14  assume that that message is going to be checked, that
15  this is the number that I have, this is the number
16  for the provider and the provider is going to check
17  that message.
18     Q  Let me ask you this.  If you felt that this
19  patient in this situation needed to be on antibiotics
20  on Friday and you failed to send the prescription
21  back with him for whatever reason and you felt in
22  your heart of hearts I need to get him on this
23  medication today, you would have tried to contact a
24  live person at the jail?

## Page 98

1      A  I would have tried to see --
2   MR. PRENGAMAN:  Objection, form.
3   THE WITNESS:  I would have tried to see if there
4   was another way to contact.
5   MR. QUINN:  I'm done.
6   MR. PRENGAMAN:  Nothing based on that.
7   MR. QUINN:  Thanks, Doctor, for your time.
8   THE WITNESS:  No problem.  No problem.
9            *****

## Page 99

1   STATE OF ILLINOIS   )
                        ) ss:
2   COUNTY OF C O O K   )
3
4        The within and foregoing deposition of the
5   aforementioned witness was taken before
6   LISA A. BORDEN, C.S.R., and Notary Public, at the
7   place, date and time aforementioned.
8        There were present during the taking of the
9   deposition the previously named counsel.
10       The said witness was first duly sworn and was
11  then examined upon oral interrogatories; the
12  questions and answers were taken down in shorthand by
13  the undersigned, acting as stenographer and Notary Public;
14  and the within and foregoing is a true, accurate and
15  complete record of all of the questions asked of and
16  answers made by the aforementioned witness, at the
17  time and place hereinabove referred to.
18       The signature of the witness was not waived,
19  and the deposition was submitted, pursuant to
20  Rules 30 (e) and 32 (d) of the Rules of Civil
21  Procedure for the United States District Court, to
22  the deponent per copy of the attached letter.
23
24

## Page 100

1        The undersigned is not interested in the within
2   case, nor of kin or counsel to any of the parties.
3        Witness my official signature and seal as
4   Notary Public in and for Cook County Illinois on this
5   17th day of July, A.D. 2018.
6
7
8
9
10       _____
         LISA A. BORDEN, C.S.R.
11       License No. 084-003300
         Notary Public
12       200 West Jackson Blvd.
         Suite 600
13       Chicago, Illinois  60606
         Phone: (312) 236-8352
14
15
16
17
18
19
20
21
22
23
24

25 (Pages 97 to 100)